ABRAHAM GRUNDT, Appellant, Respondent, *v.* MINNIE SHENK and Others, as Executors, etc., of JOSEPH SHENK, Deceased, Respondents, Appellants.*

Second Department, December 5, 1927.

Wills — action to recover on alleged contract to devise property to plaintiff — defendant agreed to continue in service of testator upon testator stating that he would devise plaintiff $50,000 — plaintiff continued in testator's service until his death — plaintiff is entitled to recover — witnesses — attorney of testator competent to testify as to instructions to include $50,000 in will for plaintiff.

Plaintiff seeks to recover the sum of $50,000 from the estate of the testator and bases his claim upon an alleged agreement by the testator to pay him that amount if plaintiff would continue in the service of the testator. The evidence shows that testator was engaged in the real estate business; that the plaintiff was in his employ and that the testator regarded the continuance of plaintiff's service as vital to the success of the testator's business; that the plaintiff in 1919 informed the testator that he was about to leave his employment and that the testator at that time made the alleged agreement with the plaintiff. The plaintiff continued in the service of the testator from the date of the

* Revg. 127 Misc. 889.

agreement until the testator's death.  The evidence also establishes the fact that plaintiff was regarded by the testator as an intimate employee and the defense conceded that the service rendered by the plaintiff was very valuable. Furthermore, there is evidence to the effect that instructions were given by the testator to his attorney to draft a will and to include an item of $50,000 for the plaintiff.  This will was not drawn, as the testator died as the result of an accident a short time after the instructions were given.  In view of the fact that the alleged agreement was clearly established by the plaintiff's evidence and that the plaintiff continued in testator's employ and fully carried out the alleged agreement, it is no defense that the plaintiff might have abandoned the testator's service at any time without rendering himself liable.

It is clear from the record that the plaintiff and the testator contemplated a continuance by the plaintiff of the same or similar service that had been theretofore rendered, and, therefore, the contract did not lack definiteness and certainty in this respect.

The attorney for the testator was competent to testify in reference to instructions given him for the drafting of a will, since it appears that the instructions were given to him by the testator in the presence of the plaintiff.  The fact that the plaintiff was the third person present when the conversation was held between the testator and his attorney did not affect the admissibility of the testimony by the attorney.

APPEAL by the plaintiff from a judgment of the Supreme Court, entered in the office of the clerk of the county of Westchester on the 13th day of November, 1926.

Appeal by the defendants from an order of the Supreme Court, entered in the office of the clerk of the county of Westchester on or about the 5th day of November, 1926.

A reargument of these appeals was directed owing to the death of the late Presiding Justice KELLY.  (See 222 App. Div. 678.)

The sole defendant now before us is Minnie Shenk, as executrix of the last will and testament of Joseph Shenk, deceased, the remaining defendants, Matzkin, Dworkin and Braveman, having resigned as executors.

The action is based upon an agreement made between the plaintiff and said Joseph Shenk, in October, 1919.  The complaint alleges that, plaintiff then being an employee of said Shenk, " and intending to leave " such employment, it was agreed between them that plaintiff was to continue in the employ of Shenk and devote himself to the advancement of the latter's interests and business affairs " and in consideration of the agreement and promise of the plaintiff so to do, which agreement and promise was then and there made and given by plaintiff to the said Joseph Shenk, the said Joseph Shenk then and there agreed and promised, that he would make and execute a Last Will and Testament, wherein he would provide that plaintiff should receive a specific bequest of the sum of Fifty thousand dollars in cash, and that upon the death of said Joseph Shenk, the plaintiff would and should receive, by reason

Second Department, December, 1927.                    [Vol. 222

of the provision of the Last Will and Testament of the said Joseph Shenk, the sum of Fifty thousand ($50,000) Dollars in cash."

There was submitted to the jury, pursuant to section 459 of the Civil Practice Act, the following question for specific answer in writing:

" Question: Did Abraham Grundt, the plaintiff, and Joseph Shenk, the decedent, in October, 1919, enter into an agreement wherein the plaintiff promised to continue in the employ of said Shenk and devote himself to the advancement of the interests and business affairs of the said Shenk and wherein said Shenk promised to leave by his will to the plaintiff the sum of fifty thousand dollars."

To this question the jurors answered " Yes." Decision on motions by both sides was reserved, and thereupon defendant's motion to set aside the verdict and to dismiss the complaint upon the law was granted, which disposed of defendant's motion to set aside the verdict as against the weight of the evidence. The trial court in an opinion held that plaintiff's contract was legally unenforcible and that his promise to " continue " in decedent's employ " constituted no consideration at all for the alleged promise of the decedent." And it was further said in that opinion: " The promise of the plaintiff, as established by the verdict, was ' to continue in the employ of said Shenk and devote himself to the advancement of the business affairs and interests of the said Shenk.' Analyzing it (1) the plaintiff binds himself to remain for no definite term; (2) no rate of compensation to the plaintiff, if any, is prescribed; (3) no specific service to be rendered is provided for; and (4) whatever continued employment is contemplated is clearly at will. The plaintiff's promise is in the category of those ' indefinite, vague and illusory ' promises, which practically bind the promisors in no way. (See *Wallach* v. *Mendelson*, 115 Misc. 499.) Such an indefinite arrangement, which plaintiff was at liberty to repudiate or discontinue immediately after making it, cannot and does not furnish a legal basis of recovery by the plaintiff." (127 Misc. 889.)

*Abel E. Blackmar* [*Percival E. Jackson* with him on the brief], for the plaintiff.

*Francis G. Caffey* [*Joseph Lorenz* with him on the brief], for the defendants.

KAPPER, J. In October, 1919, the time of the making of the agreement, the decedent was engaged in real estate speculation, then holding title to over sixty parcels of property. These properties stood in the name of the Shenk Realty and Construction Company. It was conceded that Shenk was practically the owner

of that company, holding ninety-eight per cent of its stock. Shenk's financial interest in these properties was said to represent an equity of some two million dollars; and defendant conceded the value of these equities, in October, 1919, to be " approximately a million dollars." The mortgages on these properties were first, seconds, thirds and even on the rents; and it seems to be quite apparent that Shenk's real estate interests and business needed handling by someone fully acquainted with its details and competent to manage it. There is no evidence of any one closer to Shenk than the plaintiff in the handling and managing of his affairs. It was conceded that plaintiff was in Shenk's employ from 1910 down to the date of Shenk's death in February, 1923. At the time of the making of the agreement, Shenk said to the witness Rosenfeld that as " a certain case is facing me," he " must " have plaintiff stay with him, speaking of him as follows: " He is very competent; he knows my affairs and I must have him."

It is unquestioned that the " certain case " which was " facing " Shenk was the fact that he had been convicted in the Court of General Sessions in the County of New York of the criminal offense of keeping a disorderly house; and that the conviction had been affirmed by the Appellate Division (*People* v. *Shenk*, 181 App. Div. 753). It is furthermore conceded that Shenk was confined in the Blackwell's Island Penitentiary for about nine months, and that the additional fact, in sequence, was that the Appellate Division affirmance of the conviction was in February, 1918; and that what was " facing " Shenk was the pendency of his case in the Court of Appeals which was decided March 16, 1920 (228 N. Y. 574).

Rosenfeld further testified that Shenk told him that the plaintiff wanted to leave him; that plaintiff had informed him that there was " an active market," and that he, plaintiff, " could make my way in the future," the upshot of this resulting in the promise of Shenk to will plaintiff $50,000; that Shenk said to plaintiff " I will put it in my will, and I will see that you get $50,000; " that plaintiff and Shenk shook hands, the plaintiff saying: " All right, Mr. Shenk. I will remain with you. I had rather go out, but under the circumstances I will remain with you." This witness Rosenfeld had himself been in Shenk's employ and does not appear to have had unfriendly feelings to the defense nor any relations that would justify a charge of prejudice.

Jacob R. Schiff, member of the bar, was of the firm of Morrison & Schiff, attorneys in some matters for Shenk. In November, 1922, Shenk called on him professionally. Plaintiff was present at the time. He further testified: " Q. What was said by Mr. Shenk in the presence of Mr. Grundt on this occasion? A. Mr.

Shenk handed me a paper and said ' Schiff, here I have drawn a memorandum for a will I want you to prepare, in accordance with these instructions.' "

The paper was in the handwriting of the deceased. In it appears plaintiff's name and the figures " $50,000 " opposite thereto, besides numerous other names and figures. No will was executed by Shenk in accordance with this paper, the decedent dying as the result of an accident about two months thereafter. Schiff further testified regarding this conversation with Shenk: " A. I looked at the paper. I glanced through the provisions, and I said ' What is that for Abe Grundt? Is that $50,000 ? ' He said, ' Yes, $50,000. That is something I promised Abe long ago.' Q. What else was said? A. I said all right. I didn't say any more. * * * By the Court: Q. Was that said while Mr. Grundt was right there? A. Yes, he was right there, present."

Schiff's testimony was sought to be affected because of a comparatively large claim which Schiff's firm had against the estate for services. Any theory that Grundt had an intention in mind to help Schiff out with his firm's claim leaves us in the realm of surmise, but Schiff's credibility was for the jury. There was undoubted intimacy between Shenk and Schiff, the former having an office in the Morrison & Schiff suite, where plaintiff was to be found in Shenk's employment.

A witness, Sternberg, was called by plaintiff, but he does not appear to me to have testified to much other than plaintiff's close relations to Shenk, and Shenk's high regard for the plaintiff's work, as well as Shenk's confidence in plaintiff's ability to take care of all of his matters, followed by the general loose statement of Shenk that he always took care of his boys and that " living or dying they will all be taken care of."

Similar testimony of plaintiff's activities and valuable labors in behalf of Shenk were given by Mr. Hackett, vice-president of the Colonial Bank, showing that all of the matters of discounts and loans relating to the Shenk properties were matters of business conducted by the bank with plaintiff on Shenk's behalf.

Dr. Schwartz was the penitentiary physician during Shenk's incarceration. He attended and treated Shenk while there, and met plaintiff there, but the number of times that plaintiff visited Shenk at the penitentiary was excluded after long colloquy, but this significant ground of exclusion was stated by the learned trial justice: " The Court: I will say this: If there is no objection I will take the offer, and I will reject it. I reject the offer on the ground that it being conceded that he was still in the employ after the date of the alleged contract, this proof is of no moment. It is

conceded that Grundt remained in Shenk's employ from October, 1919, until Shenk died. There is no question about *the character* of his services, *or the efficiency thereof.* Is that right? Mr. Lorenz [Defendant's counsel]: Yes."

This concession of the defense about there being no question of the character of plaintiff's services or the efficiency thereof, is of importance to a decision here.

Dr. Schwartz further testified that Shenk told him of his worries and of his intention to get rid of all his holdings and to thereafter lead a quiet life, in the course of which conversations Shenk told him that " he would take care of Mr. Grundt." Further: " Q. Did he discuss his relationship with Mr. Grundt? A. Yes, he did. Q. Tell us what he said on that score. A. He told me very frankly and openly — I didn't ask him — he told me that Mr. Grundt was his right hand man, and that without him he couldn't do a thing. Q. Did he discuss his business affairs with him? A. Not in detail. * * * Q. Well, the fact is that he told you that Mr. Grundt was his right hand man? A. Yes. The Court: Did he say that? Q. He told you that Mr. Grundt was his right hand man, and that he couldn't get along without him? A. He did."

Rosenfeld was recalled and testified, in effect, that at the time of Shenk's promise to will plaintiff $50,000 if he continued in his employ, the plaintiff shook hands with Shenk and said: " All right, Mr. Shenk, I will remain."

The trial closed without any testimony on the part of the defense other than that given by one Walter Scott who was engaged in the business of projecting upon screens enlargements of objects, and who showed a magnified projection of plaintiff's Exhibit I, from which he concluded that the " 50 " in the figures " 50,000 " were written over figures of another amount. There is no claim that these figures were forged, but the argument upon that score is that it was Shenk's intention to simply make a gift of some amount to plaintiff and dallied about what the sum of such gift would be.

It seems to me obvious that it was vitally important to decedent to have some one on whom he could rely in case the conviction referred to should be affirmed. Just at this time plaintiff told him that he proposed to leave and go into business for himself. The plaintiff knew the decedent's affairs; the decedent believed the plaintiff to be competent and thought that he must have him. Decedent, therefore, made the proposition and plaintiff said that under the circumstances he would remain. And the plaintiff did remain. He managed the decedent's business to the decedent's satisfaction while the decedent was in prison, and until the

decedent's death. This promise so performed, the decedent regarded as properly compensated by a bequest of $50,000. This is plainly evidenced by the fact that in November, 1922, he gave his lawyer, Mr. Schiff, written instructions to draft a will in which plaintiff was to receive $50,000. This will, as already stated, was never drawn and decedent died as the result of an accident within two months thereafter, or a little more. The question, then, is, why should not decedent's estate make good his promise? The only answer given is, that the promise of plaintiff, which is the consideration for decedent's promise, is illusory because it is said that plaintiff, notwithstanding his promise and not in violation of it, might have abandoned the decedent's service an instant after the promise was made.

In determining whether the contract was made, the jury's verdict, based in my opinion upon sufficient evidence, answers that proposition. In determining its construction the opinion of Judge MARTIN in *Gillet* v. *Bank of America* (160 N. Y. 549, 555) is of great aid: " In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion and apparent object of the parties, to determine the meaning and intent of the language employed. Indeed, the great object, and practically the only foundation of rules for the construction of contracts is to arrive at the intention of the parties. This is a most conspicuous and far-reaching rule, and involves the nature of the instrument, the condition of the parties and the objects which they had in view, and when the intent is thus ascertained, it is to be effectuated unless forbidden by law. ' Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.' " Placing ourselves, therefore, in the situation of the parties at the time of the making of the agreement, we have, as already shown, Shenk's solicitude and anxiety that plaintiff continue and remain and look after his business and affairs and plaintiff's expressed intention of leaving followed by his consenting to continue and remain. If the agreement to continue in Shenk's employ and to devote himself to the advancement of the interests and business affairs of Shenk upon the latter's promise to leave him $50,000 by his will can be said to have been unilateral and unenforcible despite the present tendency of the courts to read into an agreement a reciprocal promise even when it is not expressed, where the agreement taken as a whole is " instinct with  *  *  *  an obligation " (See *McCall Co.* v.

*Wright,* 133 App. Div. 62, 68; *Moran* v. *Standard Oil Co.,* 211 N. Y. 187, 198), we have here the undisputed fact and, indeed, the concession that the services contemplated by the agreement have been fully and fairly performed.

" A promise that was originally too indefinite, may by performance become definite and as the other party to the bargain must be regarded as continuously assenting to receive such performance in return for his own promise, a valid unilateral contract arises on receipt of such performance." (1 Williston Cont. § 106.)

In *Miller* v. *McKenzie* (95 N. Y. 575, 579) Judge EARL, writing for a unanimous court, cites and quotes from numerous cases in support of the following view of the law: " Here the future services were rendered, and there is no authority which we are bound to respect which holds that, in such a case, the future services, in order to furnish a consideration, must have been rendered under a contract binding the promisee to render them. If the plaintiff was not, at the time she made the promise, bound to render the future services, her subsequent rendition of them furnished the consideration to uphold the note, and makes the consideration of the note in that respect just as good and valid as if she had made a binding promise to render them."

A late expression upon the subject of mutuality of obligation in contracts is that of Judge VANN in *Grossman* v. *Schenker* (206 N. Y. 466, 468), viz.: " Even when the obligation of a unilateral promise is suspended for want of mutuality at its inception, still, upon performance by the promisee a consideration arises ' which relates back to the making of the promise, and it becomes obligatory.' "

Upon this branch of the case I am unable to distinguish the present case from the numerous reported cases where the agreement was to care for or board and lodge or perform other services for a testator in consideration of the latter's promise to compensate by will. Such a case was the one recently before us entitled *Matter of Hinsch,* where we upheld an oral agreement which provided that in consideration of a stepdaughter's promise to come and live with the stepmother and to render services as housekeeper, the stepmother would, by will, provide for the payment to the claimant of $25,000 and affirmed the claimant's recovery (209 App. Div. 828). The case went to the Court of Appeals where it was unanimously affirmed without opinion (239 N. Y. 519). I fail to see where that contract was one whit more definite and certain than the contract here involved. There was nothing binding the stepdaughter to remain with the stepmother, and she could have left her the day following her entrance upon performance. But

she stayed until the stepmother died, and the obligation to pay the $25,000 arose by virtue of the performance of the required service upon the part of the promisee.

The oft-cited case of *McKeon* v. *Van Slyck* (223 N. Y. 392) shows the contract to have been a promise on the part of the plaintiff to furnish the defendant's intestate with a room in her home and board him and take care of him whenever he came to the city of New York, in consideration of which he promised to leave plaintiff by will the sum of $25,000. In that case it appeared that the intestate, in frequent visits to the city of New York, was intoxicated and unable to care for himself for days at a time. The case obtained no discussion as to the definiteness of this contract, its legality being apparently assumed, the opinion of the Court of Appeals treating wholly of the kind and character of evidence that should obtain to establish the contract. It is cited here to show that the plaintiff there could have turned Brown adrift at any time after the performance of the agreement was commenced by her, but she did not do it; on the contrary, carrying it out until Brown died, and the obligation to pay then arose because he did not make the will with its bequest to plaintiff which he had promised to make.

*Ide* v. *Brown* (178 N. Y. 26), upon which the defendants rely, does not seem to me to have the effect or applicability for which defendants contend. There, a promise was made by a guardian that his ward would continue to live with one Lee (the testator) in consideration of which it was claimed that Lee agreed to bequeath the ward a specified sum on his death and also would devise to her the house and lot in which they resided; and it was held that the guardian was powerless to compel the ward to live with Lee for any period which might extend beyond her majority, and that such guardian had no power by contract or otherwise, either before or after his ward's majority, to bind her thereafter in the disposition of her time, services or property. Hence, it was held that upon Lee's death without fulfillment of his promise, equity would not decree specific performance of his promise against his estate. I cannot see any likeness between the two cases.

Much reliance has also been placed by the appellant upon the case of *Wallach* v. *Mendelson* (115 Misc. 499, opinion by Mr. Justice LEHMAN), where an agreement was said to have been entered into between plaintiff and defendants, the former to continue in defendants' employ as salesman for a season to procure orders for furs and to receive commissions upon orders. It was held that plaintiff's promise to continue in defendants' employ for this season was " purely illusory and can constitute no con-

sideration for the defendants' agreement if the plaintiff ' has it in his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promisee.' Williston Cont. § 104." But this had to do with plaintiff's effort to recover damages for a *wrongful discharge* and had no relation, as I read it, to an *executed contract.* As to the suggestion adopted by the learned trial justice, that the contract at bar was indefinite in its provisions regarding the character of the services to be performed, it seems to me that the criticism is answered by the evidence which showed the relations of the parties and what plaintiff had been doing. Coupled with the vastness of Shenk's interests and the difficulties then confronting him, the words " continue " or " remain " have an all-sufficient definiteness and certainty and require enforcibility. In *Chard* v. *Ryan-Parker. Construction Company* (182 App. Div. 455, 461) it was said by Mr. Justice SHEARN: " The claim of indefiniteness urged against the contract would be valid if the contract were an executory one. It is quite conceivable that, under some circumstances, a contract calling for the employment of one to render services ' in a managing or advisory capacity ' would be upheld as sufficiently definite, as in the case of an ordinary employment contract. Not so, however, in the case of such an extraordinary contract as this, where a corporation agrees, instead of paying dividends to its stockholders, to divide its profits, running into hundreds of thousands of dollars, with one who agrees to render no specified services whatever. But the difficulty with defendant's position is that the contract has been executed, assuming that the plaintiff did, as the jury found, render some services and all that he was called upon to render, and assuming further that the contract contemplated such services and not the sale of political influence. If one performs services under a contract, no matter how general and vague the description of the services to be rendered may be in the contract, it is certainly no defense on the part of another who has accepted the services to say that the agreed compensation shall not be paid because the services were not sufficiently pointed out or described in the contract."

Considering, therefore, the inferences to be drawn from the record, it must be concluded that the parties contemplated a continuance of the same or similar services that had been theretofore rendered by the plaintiff and in this respect the contract did not lack that definiteness and certainty essential to a binding agreement.

The claim that the testimony of Schiff and the memorandum given to him by Shenk upon which to formulate the proposed will,

were incompetent, because Schiff as Shenk's lawyer was thereby divulging a confidential communication, seems to me to be fully answered by the case of *Hurlburt* v. *Hurlburt* (128 N. Y. 420). The fact that plaintiff was the third person present on the occasion of this conversation between Shenk and Schiff did not affect the admissibility of the testimony given by Schiff. It was not given by plaintiff, in which case an entirely different rule would have prevailed.

I advise that the judgment directed for the defendants be reversed upon the law, with costs, and that judgment be directed in plaintiff's favor for the amount of his claim, together with interest thereon for a period commencing one year after the appointment of the executors; and that the order denying defendants' motion to set aside the special verdict be affirmed, without costs.

LAZANSKY, P. J., YOUNG, SEEGER and CARSWELL, JJ., concur.

On reargument, judgment reversed upon the law, with costs, and judgment directed in plaintiff's favor for the amount of his claim, together with interest thereon for a period commencing one year after the appointment of the executors; order denying defendants' motion to set aside special verdict affirmed, without costs.